IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

- - -

RICKY P. COGGINS, as        :   CIVIL ACTION
Administrator of the        :
Estate of GLEN E.           :
COGGINS, SR., deceased,     :
                            :
        Plaintiff,          :
                            :
    VS.                     :
                            :
THE DUPPS COMPANY,          :
an Ohio Corporation,        :
                            :
        Defendant.          :   NO.  CIV-14-425-C

- - -

        Videotaped deposition of JOSEPH B. SALA,

Ph.D., taken at Summit Court Reporting,

Incorporated, 1500 Walnut Street, Suite 1610,

Philadelphia, Pennsylvania, on Monday, March 23,

2015, beginning at approximately 1:20 p.m., before

Robin Frattali, Registered Professional Reporter

and Notary Public in and of the Commonwealth of

Pennsylvania.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com



JOSEPH B. SALA, Ph.D.

1    not been injurious in and around a product or in

2    and around an environment.

3         Q.    Have you personally done studies on

4    behavioral compliance?

5         A.    I have.

6         Q.    What kind of products?

7         A.    There have been a number of them.  For

8    example, I've done a study involving an air

9    compressor, looking at people's information

10   seeking patterns and compliance and attention to

11   warnings associated with an air compressor, as

12   well as a hand truck whose tire they were

13   attempting to fill.

14        Q.    Tell me, what did you do with the air

15   compressor?  How did you test warnings?

16        A.    We had individuals come in and, under

17   the context that they were going to be moving

18   items, to attempt to fill the tires of a hand

19   truck so that they could load boxes on it, and

20   what was available to them was an air compressor

21   and a hand pump in order to do it.

22                    And so we brought them in and

23   we had them perform this task under a controlled

24   and observed context, and were able to assess

JOSEPH B. SALA, Ph.D.

1   any conclusions, it's not going to impact or

2   influence your opinions in this case.

3        A.    I was not planning on referencing that

4   experiment for the purposes here.

5        Q.    Are there any other experiments that

6   you have personally done yourself related to

7   warnings other than the one that you told us that

8   has not been completed?

9        A.    Yes, there -- there are other -- other

10  research.

11       Q.    Tell me about your other research.

12       A.    One of them was looking at people's

13  knowledge and understanding of Proposition 65

14  warnings in the State of California.

15       Q.    Was that the gay marriage initiative?

16       A.    No, that is a -- a law in California

17  requiring products in environments that contain a

18  chemical known -- or in the language of the law

19  known to the State of California to -- to cause

20  cancer or birth defects to be disclosed to the

21  pop -- to the public.

22       Q.    So it's a chemical warning.

23       A.    Yes.

24       Q.    Did you do that when you were out at

JOSEPH B. SALA, Ph.D.

1    ones that did notice the warnings said they just

2    disobeyed or disregarded the warning.

3         A.    No, I don't think that that's --

4    that -- that -- that would not be my testimony.

5    I -- I can't speak to an exact percentage of what

6    everyone said or how they said it to us.  I could

7    look back at the study to -- to assess the -- the

8    exact frequencies of these questions.

9         Q.    Well, let me ask you this.  If there's

10   a warning and say 100 people see the warning, 99

11   people disregard it but one person sees the

12   warning, heeds the warning and follows the

13   warning, it saves that person from getting injured

14   or killed, it's worth having that warning, isn't

15   it?

16        A.    Again, I -- I'm not arguing that --

17   that a person can seek that information and can

18   heed that information, that's one of the purposes

19   for including a warning.

20        Q.    Your study in California, does it have

21   a name or is it published somewhere?

22        A.    I believe it does.

23        Q.    Is it on your publications?

24        A.    Yes.  It's on page three.  It's the

**JOSEPH B. SALA, Ph.D.**

1    listing for Huntley-Fenner G, Wood CT, Sala JB

2    Study of the Impact of California's Proposition 65

3    warnings on safety related awareness and

4    behaviors.  Proceedings, Society for Risk

5    Analysis, San Antonio, Texas, December 9th

6    through 12th, 2007.

7       Q.    Was that a seminar or a professional

8    meeting?

9       A.    It was a professional meeting, yes.

10      Q.    And you presented that at that time?

11      A.    I did.

12      Q.    Was that study peer reviewed?

13      A.    Yes, it was.

14      Q.    By who?

15      A.    By the committee and professionals for

16    that meeting.  I don't know who the peer --

17    what -- who the reviewers were.

18      Q.    Any other studies that you've

19    personally participated in relating to warnings?

20      A.    There were a number of -- of work

21    and -- and studies related to warnings that --

22    that I've been involved in over the time.  The two

23    that we just spoke of are ones I can remember

24    details as to the experiment protocol that we've

JOSEPH B. SALA, Ph.D.

1  reasonable degree of scientific certainty, as to

2  Mr. Coggins' adherence to the purported warning

3  that Mr. Ryan suggests to have been there.

4       Q.    Tell the jury what physical test you

5  performed in this case.

6       A.    A physical test?

7       Q.    Yes, sir.

8       A.    I'm sorry.

9       Q.    Yes, sir.

10      A.    I -- I have not performed a physical

11  test.  I have --

12      Q.    Tell --

13      A.    Didn't perform a physical test.

14      Q.    Tell the jury what studies you

15  conducted in this case.

16      A.    There was not an independent study to

17  be conducted in this case, rather it was more of a

18  meta-analysis and an application of the scientific

19  literature, what we know about warning compliance

20  to the available facts in this case, to make a

21  scientific determination.

22      Q.    Tell the jury how long you spent doing

23  a physical inspection of the machine in question.

24      A.    I'm sorry, can you repeat the

1  standard of care that can be applied across all

2  situations.

3      Q.    Well, when we're talking about

4  manufacturing industrial equipment, factory

5  equipment --

6      A.    Uh-huh.

7      Q.    -- like we have here, is it your

8  testimony today there is no standard or body that

9  sets what the standard of care is as it relates to

10  warnings?

11      A.    Across all industrial equipment, no.

12      Q.    What about this industrial equipment

13  that's at issue in this case --

14      A.    I do not --

15      Q.    -- who -- hang on.  Who sets the

16  standard of care?

17      A.    Again, I do not -- I do not know of

18  any particular standard of care for the rendering

19  industry as it relates to warnings for such

20  products.

21      Q.    You don't know what the standard of

22  care is for warnings in the rendering industry --

23  rendering industry, correct?

24      A.    I have not seen any -- any body that

JOSEPH B. SALA, Ph.D.

1    sets the standard of care for warnings in the

2    rendering industry.

3        Q.    Let me ask my question again.

4              You do not know what the

5    standard of care is in the rendering -- rendering

6    industry as it relates to warnings?

7        A.    To my knowledge, I have not seen a

8    specified or standardized standard of care for

9    warnings as it relates to the rendering industry.

10       Q.    You don't know.

11       A.    I have not found that.  I have looked

12   for such information and I see nothing specific to

13   rendering.

14       Q.    Well, if there's nothing setting the

15   standard of care as it relates to warnings in this

16   industry, then anybody can just come in and say

17   whatever they want because there's nothing to set

18   the standard, correct?

19       A.    No, I think that still you can cite to

20   relevant -- relevant scientific research, relevant

21   standards that have a potential to be applied and

22   can be considered more broadly, and that is how,

23   in fact, I -- I have addressed this issue.

24       Q.    But I think you've told us earlier

1   compliance across a number of industries, across a

2   number of situations, and to utilize that to --

3   to -- to address issues related to human behavior

4   in a specific situation.

5        Q.   If you tell me there's no standards

6   related to warnings in the industry that we're

7   here about, then there has to be some subjective

8   part of what you do to arrive at your opinions,

9   correct?

10       A.   Well, there is -- I wouldn't say it's

11   a subjective part. I would say that it's grounded

12   in the scientific fields and research in the issue

13   of behavioral compliance, in attention, in the

14   human factors areas related to the transmittal of

15   safety information in general.

16       Q.   You can have two experts look at the

17   same case and have two different opinions,

18   correct?

19       A.   Well, I think that that happens

20   frequently.

21       Q.   Now, back to your report here at the

22   bottom of page ten where we were talking about the

23   warnings -- well, excuse me, I'm going to go back

24   to page nine, and we were talking about the ANSI